J-A11015-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| D.M., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| J.M. AND A.M. AND S.H. F/K/A S.M., | |
| Appellees | No. 1906 MDA 2016 |

Appeal from the Order Entered October 19, 2016
In the Court of Common Pleas of Susquehanna County
Civil Division at No(s): 2016-00141

BEFORE:  SHOGAN and MOULTON, JJ., and STEVENS, P.J.E.[*]

MEMORANDUM BY SHOGAN, J.:                    **FILED JUNE 19, 2017**

D.M. ("Father") appeals from the order entered on October 19, 2016, awarding shared legal custody to J.M. ("Paternal Grandfather") and A.M. ("Paternal Grandmother") (collectively, "Paternal Grandparents"), of Father's and S.H. f/k/a S.M.'s ("Mother")[1] five-year-old son, C.M. ("Child").  The order also awarded primary physical custody of Child to Paternal Grandparents and partial physical custody to Father, in accordance with a schedule that gradually increased Father's periods of physical custody. Following our careful review, we affirm.

_____

[*]  Former Justice specially assigned to the Superior Court.

[1]  Mother participated in the proceedings but did not seek partial custody or visitation.

The trial court set forth the factual background and procedural history of this appeal, which we adopt herein. Trial Court Opinion, 10/19/16, at 1–3. Significantly, in July of 2012, when Child was approximately nine months old, Mother attempted to suffocate him in Paternal Grandparents' residence, where Father, Mother, and Child had been residing. Mother pled guilty to endangering the welfare of a child and was sentenced to probation. She has had no contact with Child since July of 2012. *Id*. at 1; N.T., 9/26/16, at 21, 23.

Father and Child continued to reside with Paternal Grandparents until April of 2014, when Father took Child to live with Father's fiancée, M.S. ("Fiancée"). Trial Court Opinion, 10/19/16, at 3; N.T., 9/26/16, at 18–19, 57. Father and Fiancée have a daughter, T.M. ("Sibling"), born in December of 2013. Trial Court Opinion, 10/19/16, at 2. Six weeks after Father and Child moved out of Paternal Grandparents' residence, Susquehanna Children and Youth Services ("CYS") investigated an abuse claim regarding Child's treatment in the home of Father and Fiancée. N.T., 9/26/16, at 20. Father was indicated[2] for child abuse through neglect, as Child was diagnosed with failure to thrive based on a two-pound weight loss since moving from

---

[2] "An 'indicated report' of child abuse is made by the investigating agency when it determines that substantial evidence of the alleged abuse exists based on any of the following: available medical records, the child protective services investigation, or an admission of abuse by the perpetrator. 23 Pa.C.S. § 6303." **C.S. v. Dep't of Pub. Welfare**, 879 A.2d 1274, 1277 n.4 (Pa. Cmwlth. 2005).

Paternal Grandparents' home. At that time, Father agreed to allow Child to reside with Paternal Grandparents, and no dependency action was filed. *Id*. at 60–63; Trial Court Opinion, 10/19/16, at 2. Although Father did not participate with CYS services, the case was closed. Sibling has continued to reside with Father, who is the primary caregiver, and Fiancée, who works to support the family. N.T., 9/26/16, at 54, 56.

On February 16, 2016, Father filed a custody complaint against Paternal Grandparents, with whom Child had been residing. In a March 28, 2016 temporary custody order, the trial court ordered supervised visitation for Father. The order provided Father with partial physical custody every Saturday from noon until 6:00 p.m., "to be supervised by [Paternal Grandparents] or, at their discretion, to be . . . unsupervised contact if they believe that the relationship between [Child] and [F]ather had progressed . . . ." Order, 3/28/16, at 1. The order also granted Father reasonable telephone contact with Child between 8:00 a.m. and 8:00 p.m. *Id*. The order provided for "any other periods of partial physical custody and/or visitation [for Father] that the parties determine is appropriate by mutual agreement." *Id*.

On September 26, 2016, the trial court held a custody hearing at which Father, Mother, Fiancée, Paternal Grandparents, B.R., Child's great-grandfather ("Great-Grandfather"), and the CYS caseworker testified. Following the hearing, the trial court entered the appealed order on

October 19, 2016, awarding shared legal custody to Father and Paternal Grandparents, primary physical custody to Paternal Grandparents, and partial physical custody to Father in accordance with a schedule that granted Father a gradual increase in partial physical custody. The order provided, in pertinent part, as follows:

3. During the remainder of the 2016-17 school year, Father ([D.M.]) shall have a period of partial custody with [Child] every weekend on Saturday or Sunday from 9:00 a.m. until 5:00 p.m.

4. Commencing during the summer of 2017, Father shall have partial custody of [Child] every other weekend from Friday night at 6:00 p.m. until Saturday at 6:00 p.m., and then on the alternating weekends on either Saturday or Sunday (as agreed upon between the parties) from 11:00 a.m. until 4:00 p.m. This period of partial custody shall commence on June 1, 2017.

5. Upon commencement of the 2017-18 school year, Father shall have partial custody of [Child] every other weekend from Friday at 6:00 p.m. until Sunday at 6:00 p.m.

6. Upon commencement of the 2017-18 school year, Father shall not receive any alternating weekend Saturday or Sunday partial custody, but Father thereafter shall have partial custody one night every week (the specific day to be determined by the parties between Monday and Thursday) from 5:00 p.m. until 7:00 p.m.

7. Commencing in the summer of 2018, Father shall receive two (2) non-consecutive weeks of partial custody of [Child] with the parties to agree upon the dates prior to June 1st of each year.

8. Mother ([S.M. a/k/a S.M.H.]) shall have periods of partial custody/visitation as agreed upon between the parties and such consent will not be unreasonably withheld.

9. The parties shall share transportation equally with the party receiving custody to provide transportation.

10. Father shall have reasonable telephonic contact with [Child].

11. While in the presence of [Child], no party shall make or permit any other person to make any remarks or do anything which would in any way be construed as derogatory or uncomplimentary to the other parties. It shall be the express duty of each party to uphold the other party as one whom [Child] should love and respect.

12. Each party shall have the duty to notify the other of any event or activity that could reasonably be expected to be of a significant concern to the other party or to [Child].

13. The parties shall communicate with one another concerning any parenting issues requiring consultation and agreement regarding a proposed modification of the custody schedule which may, from time to time, become necessary, and shall specifically not use [Child] as a messenger at any time. Neither party shall discuss with [Child] any proposed changes to this schedule or any other issue requiring consultation and agreement prior to discussing the matter and agreement with the other party.

14. Father shall have partial custody on holidays as follows and this schedule will supersede the general partial custody provisions:

a. Thanksgiving: From 2:00 p.m. on Thanksgiving Day until noon on the following day;

b. Christmas Day: From 2:00 p.m. on Christmas Day until noon on December 26th;

c. New Year's Day: From noon on January 1st until noon on January 2nd unless January 2 is a school day and then 6:00 p.m. on January 1st[;]

d. Easter: [F]rom 11:00 a.m. until 4:00 p.m. on the Saturday prior to Easter or on Easter Sunday upon agreement of the parties;

e. Memorial Day, Fourth of July, and Labor Day shall alternate between the parties beginning with Memorial Day

2017 with Father. These periods of custody shall begin at 11:00 and end at 6:00 p.m.[;]

f. Father shall have custody on Father's Day from 11:00 a.m. until 6:00 p.m. regardless of which party has physical custody on that day.

15. Each party shall refrain from the use of any controlled substances, alcoholic beverages, spirits or liquors or be under the influence of same during those times immediately prior to and during the periods of custody times that they have physical custody of [Child]

Trial Court Order, 10/19/16, at 1-2.

On November 18, 2016, Father filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court did not file a Rule 1925(a) opinion; instead, it relied upon the opinion it concurrently filed with the October 19, 2016 order.

At the September 26, 2016 hearing, Father presented the testimony of Paternal Grandmother as on cross-examination. N.T., 9/26/16, at 4. Paternal Grandmother admitted that Father had once requested to take Child to a birthday party at an unspecified location, but Paternal Grandparents denied the request. *Id*. at 6. Paternal Grandmother testified that Child sees Sibling once a week when Father brings Sibling to their home. *Id*. at 10-11. Paternal Grandmother also testified that Father had only begun bringing Sibling to their home since the entry of the March 2016 interim custody order; she opined that Child and Sibling "don't get along very well." *Id*. at 13.

Paternal Grandmother also testified on her own behalf. N.T., 9/26/16, at 18–47. Paternal Grandfather is retired; Paternal Grandmother does not work outside of the home. *Id*. at 33. She stated that she resides with Paternal Grandfather, T.M., another son who is twenty-four years old, and Child. *Id*. at 18. Paternal Grandparents recently purchased a new home, but they had not yet moved into it. *Id*. at 19. Paternal Grandmother planned that Great Grandfather also would reside with them. *Id*. As noted, Paternal Grandmother testified that Mother had not seen Child since he was nine months old, following the child-abuse incident. *Id*. at 22. As part of Mother's criminal probationary sentence, Mother was permitted to have supervised visits with Child; Paternal Grandmother testified Mother never attempted to visit. *Id*. at 24. Mother testified, conversely, that Paternal Grandparents never permitted her to visit. *Id*. at 163, 167. Mother moved to Georgia for approximately three years before returning to reside in Pennsylvania. *Id*. at 23–24, 163. At the time of the hearing, Child attended pre-kindergarten. *Id*. at 24. Paternal Grandmother is the primary caregiver. *Id*.

After the entry of the March 2016 temporary custody order, Father initially had a five-minute telephone conversation with Child every day; by the time of the hearing, Father had not called in nearly two months. N.T., 9/26/16, at 25–26. Father told Paternal Grandparents he has no telephone service at his home. *Id*. at 28. Also after entry of the March 2016 order,

Father had visits with Child, but not every week. *Id*. at 29. Although the order permitted Father to have a six-hour visit, most visits were between four and five hours. *Id*. at 29–30. On most visits, Father merely sat in Paternal Grandparents' home watching television with Child or talked to other adults in the home. *Id*. at 30–31. On a few occasions, Father took Child to a nearby park. *Id*. Paternal Grandmother testified that there is a parent-child bond between Paternal Grandparents and Child, and Child refers to them as "Mommy" and "Pop-Pop." *Id*. at 31–32. Paternal Grandmother revealed that Father abused other people's pain medications and smoked marijuana when he resided in her home. *Id*. at 36–38. Paternal Grandmother also testified that Father's physician sent him to a psychiatrist because the physician believed that Father is bipolar and that Father was taking Xanax. *Id*. at 38–39.

Father then presented his own testimony on direct examination. N.T., 9/26/16, at 48. Father stated that Paternal Grandparents had disparaged him on social media and had publicly started a "GoFundMe" account seeking funds for the custody litigation. *Id*. at 48–49. Father testified that the birthday party that Paternal Grandparents had refused to allow Child to attend with Father was held after the entry of the March 2016 order. *Id*. at 53. Father has a disability resulting from a birth defect in his back, as well as a back injury. *Id*. at 54-55. He does not work and has applied for social

security disability. *Id*. at 54. Father takes a prescription muscle relaxer for muscle spasms. *Id*. at 55.

Father testified that Fiancée works as a certified nursing assistant at a senior nursing rehabilitation facility. Sibling has never been out of the couple's custody. N.T., 9/26/16, at 57–58. Father testified that CYS bullied him into agreeing to Child's physical custody with Paternal Grandparents. *Id*. at 59–64. Father never attended any parenting classes. *Id*. at 61. He explained that his cellular telephone service is unreliable in the area where he lives and that he does not have a land-line telephone. *Id*. at 64–65. Father denied not calling Child for almost two months; rather, he asserted that he had attempted to call Child but could not achieve a cellular connection. *Id*. at 65. Father also denied receiving a mental illness diagnosis or taking any type of medication, including Xanax, for a mental health condition. *Id*. at 69–70. Father stated that he was not bipolar but admitted to suffering from anxiety. *Id*. at 68–69. Father testified that he does not abuse any illegal substances. *Id*. at 68.

Father had been serving as Sibling's primary caregiver because he was home during the day, while Fiancée worked at night. *Id*. at 70–71. At the time of the custody hearing, Fiancée had a new work schedule from 5:00 a.m. to 2:00 p.m. *Id*. at 70. Father testified that his back injury did not interfere with his ability to provide childcare for Sibling. *Id*. at 71–72. Father explained that when he visits Child, they watch television, play

soccer, and occasionally go to a nearby park. *Id*. at 71–72, 82. Father testified that he loves Child and would never hurt him. *Id*. at 73.

On cross-examination, Father also admitted that he has a seven-year-old daughter, L.M., who resides with her mother in Honesdale, Pennsylvania. N.T., 9/26/16, at 79. Father has no contact with L.M. because her mother will not allow it. *Id*. Father opined that Mother should not have any partial physical custody of Child in light of the child-abuse incident and because she has not made any attempt to contact Child. *Id*. at 81–82. Fiancée confirmed that she resides with Father and Sibling. *Id*. at 94–95. She agreed that Sibling has never been removed from their custody and that Father has served as Sibling's primary caregiver due to Fiancée's work schedule. *Id*. at 96.

Paternal Grandparents presented the testimony of Kimberly Harshaw, Child's CYS caseworker. N.T., 9/26/16, at 131–132. Ms. Harshaw investigated and facilitated the removal of Child from the home of Father and Fiancée in May of 2014 because Child appeared to be malnourished and was diagnosed with failure to thrive. *Id.* at 133. Both Fiancée and Father were indicated for child abuse regarding Child's failure to thrive in 2014. *Id*. at 141. Ms. Harshaw testified that despite Child's removal, Sibling was not removed from the home because "there was no concern about her weight gain." *Id.* at 135. Ms. Harshaw testified that she advised Father that it was in Child's best interest to address Child's state of health, and Father agreed.

*Id.* at 137. Ms. Harshaw stated that Child's physician, who had consistently examined Child since birth, was concerned that Child had regressed socially, had lost interest in toilet training, and had lost two pounds during the six weeks that he had been in Father's and Fiancée's care. *Id.* at 138. Child, then two and one-half years old, appeared frightened, was skittish, and had some hair loss. *Id.* at 139. Father signed a safety plan that Child would return to Paternal Grandparents' home. *Id.* at 142. CYS concluded that Child was safe in Paternal Grandparents' home and that he was progressing. *Id.* at 143.

Great Grandfather testified that during Father's visits with Child, Father plays with Child, they watch television, and Father interacts with his brother, T.M. N.T., 9/26/16, at 147–151. Great Grandfather never observed Father or Paternal Grandparents act inappropriately with Child. *Id*. at 152–153.

Finally, Mother, who appeared *pro se*, testified on her own behalf. She favored an award of primary physical custody to Father and Fiancée because she believed it was in Child's best interests. N.T., 9/26/16, at 164–167. Mother testified that she was not seeking any contact with Child. *Id*. at 167. Mother also stated that she has a one-and-one-half-year-old daughter who resides with her. *Id*. at 167, 174.

On appeal, Father raises two issues, as follows:

[1.] Did the Trial Court err as a matter of law and commit a gross abuse of discretion by drawing unreasonable inferences

- 11 -

and arriving at unreasonable conclusions that cannot be supported from the evidence presented and by awarding the paternal grandparents primary physical custody of the minor child when it was not established by clear and convincing evidence that an award of primary physical custody to the paternal grandparents is in the best interests of the minor child [Child]?

[2.] Did the Trial Court commit a gross abuse of discretion and err as a matter of law by awarding the paternal grandparents primary physical custody of the minor child when there were no compelling reasons of record to support separating the child out of the same household from his half[-]sibling who is in the primary physical custody of the Appellant [Father]?

Father's Brief at 3.[3]

We will review Father's issues together, as they are interrelated. Father contends that the trial court made numerous factual findings that necessarily support the conclusion that the court should have awarded primary physical custody to him instead of Paternal Grandparents. He posits that these factual findings show that Paternal Grandparents did not prove it is in Child's best interest to be in their primary physical custody. Father's Brief at 12. In particular, Father asserts that Paternal Grandparents have

_____

[3] Although Father stated his issues somewhat differently in his Pa.R.A.P. 1925 (b) statement, we find that he has sufficiently preserved them for our review. Father has waived any issues which were not raised in both his second concise statement and his statement of questions involved portion of his appeal. Thus, we will review his issues as framed in his statement of questions involved portion of his brief. **See Krebs v. United Refining Company of Pennsylvania**, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both his concise statement of errors complained of on appeal and the Statement of Questions Involved in his brief on appeal).

disparaged him and have engaged in a course of conduct that has prevented Child from having a "father-son" relationship with him. Father further avers that Paternal Grandparents have prevented Child from forming a bond with Sibling. *Id*. at 13. Father directs us to the trial court determinations that Child has had little or no opportunity to form a meaningful bond with Sibling and that Father is a "capable and competent" parent. *Id*. In light of those findings, Father urges that Paternal Grandparents failed to prove by clear and convincing evidence that separating Child from Sibling is in Child's best interests, and that there is no compelling reason to maintain Child in Paternal Grandparents' home. Father's Brief at 4, 12–14.

In custody cases under the Child Custody Act ("the Act"), 23 Pa.C.S. § 5321–5340, our standard of review is as follows:

> We review the trial court's custody order for an abuse of discretion. ***S.W.D. v. S.A.R.***, 96 A.3d 396, 400 (Pa. Super. 2014). We defer to the trial court's factual findings that are supported by the record and its credibility determinations. ***Id***. However, we are not bound by the trial court's deductions or inferences, nor are we constrained to adopt a finding that cannot be sustained with competent evidence. ***A.V. v. S.T.***, 87 A.3d 818, 820 (Pa. Super. 2014). In sum, this Court will accept the trial court's conclusion unless it is tantamount to legal error or unreasonable in light of the factual findings. ***S.W.D.***, *supra* at 400.

> The primary concern in any custody case is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being." ***Saintz v. Rinker***, 902 A.2d 509, 512 (Pa. Super. 2006) (citing ***Arnold v. Arnold***, 847 A.2d 674, 677 (Pa. Super. 2004)).

*M.G. v. L.D.*, 155 A.3d 1083, 1091 (Pa. Super. 2017).

We have stated:

The discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (quoting

*Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

In *M.A.T. v. G.S.T.*, 989 A.2d 11 (Pa. Super. 2010) (*en banc*), we

observed the following regarding an abuse-of-discretion standard.

Although we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion "is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

*Id.* at 18–19 (quotation and citations omitted).

Section 5338 of the Act provides that, upon petition, a trial court may

modify a custody order if it serves the best interests of the child. 23 Pa.C.S.

§ 5338. Section 5328(a) sets forth the best interest factors that the trial

court must consider. *E.D. v. M.P.*, 33 A.3d 73, 80-81 n.2 (Pa. Super.

2011). Trial courts are required to consider "[a]ll of the factors listed in

section 5328(a) . . . when entering a custody order." ***J.R.M. v. J.E.A.****,* 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original).

Section 5328(a) of the Act provides as follows:

**§ 5328.  Factors to consider when awarding custody**

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328.

Further, we have explained as follows:

Section 5323(d) provides that a trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S.A. § 5323(d). Additionally, "section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen [Section 5328(a) custody] factors prior to the deadline by which a litigant must file a notice of appeal." *C.B. v. J.B.,* 65 A.3d 946, 955 (Pa. Super. 2013), *appeal denied*, 70 A.3d 808 (Pa. 2013). . . .

In expressing the reasons for its decision, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *M.J.M.*

- 16 -

> *v. M.L.G.,* 63 A.3d 331, 336 (Pa. Super. 2013), *appeal denied*, 68 A.3d 909 (Pa. 2013). A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d). *Id.*

*A.V. v. S.T.*, 87 A.3d 818, 822–823 (Pa. Super. 2014).

In the opinion accompanying its order, the trial court addressed the statutory analysis under Section 5327(b), regarding the presumption in primary physical custody determinations between a parent of a child and a third party, as here, as well as the factors controlling custody and best interests under Section 5328(a). We adopt the trial court's discussion herein. Trial Court Opinion, 10/19/16, at 4–18.

Moreover, while lengthy, we reproduce the trial court's on-the-record discussion with the parties' counsel herein. The exchange explains Father's challenges to the trial court's application of the Section 5327 presumption in favor of a natural parent, and the Section 5328(a) factors and his other allegations of abuse of discretion by the trial court in failing to award primary physical custody of Child to him. At the conclusion of the evidence at the custody hearing, on the record, the following exchange occurred among Father's counsel, Paternal Grandparents' counsel, and the trial court:

> THE COURT: It's your petition, [Father's Counsel], do you wish to be heard?
>
> [FATHER'S COUNSEL]: I do, Your Honor. The major problem that we have here is, I think the evidence establishes that you have parents [sic] here who, unfortunately, like to drive the bus and—who unfortunately are not willing to facilitate and promote a meaningful relationship between the—the natural father and [Child]. It's a situation where, I think, that there is a lot of

hostility between the parties, unfortunately, as shown by the fact that there is a derogatory Facebook post which was testified [to] without any objection that—basically the substance of it from [Father] was that there was no hope for [Father]. So they sort of, I would suggest to you, based on the fact that they've blocked him[,] all his family's blocked him from Facebook—they've sort of written off [Father]. I think that it's difficult. At one point, you heard [Father] say that his parents make him uneasy, you know, and that's unfortunate. It's an unfortunate situation to be in. They call themselves—[Paternal Grandmother] called herself the parental figure and, I think, views herself based upon the evidence that was present, as the mother of this child.

THE COURT: So what do you want the [c]ourt to do?

[FATHER'S COUNSEL]: I want this [c]ourt, because—based upon those concerns, that's why I highlighted those concerns—I think that the only way that—this father's going to be able to be a father, and I believe that there is no compelling evidence—clear and convincing evidence that there—that he shouldn't be allowed to, and there's no compelling evidence to state that these two siblings should live apart under different roofs, I think that at the very least to ensure that he can be a father because—the—the natural parents—the paternal grandparents here, [Father's] been signing [sic] by them and pursuing—He can't even get a 2-hour visitation unsupervised to go to a birthday party, which speaks volumes to me, Your Honor, after custody proceedings had been initiated. They are not making any effort to promote and get this to a place, they have no desire—no desire. The evidence establishes they have no desire to get them to a place where they can be—

THE COURT: So they've done everything wrong?

[FATHER'S COUNSEL]: I'm not saying they did everything wrong.

THE COURT: Even if I accepted they aren't going to cooperate, what do you want this [c]ourt to do? Do you want me pull this child out of a stable household and plug him into one where he's never lived before?

[FATHER'S COUNSEL]: I think that that's what the law requires, but—

THE COURT: No—No. The law requires continuity, the law requires stability, the law requires me to consider the best interest of the child.

[FATHER'S COUNSEL]: [W]ell, I–

THE COURT: Why in the world would I do this just overnight, especially since 2 years ago when this was done, you end up with Children & Youth involved and your child is your client was indicated for failure to thrive?

[FATHER'S COUNSEL]: Because they have not met their burden. It's their burden and I would say, Your Honor, that 6 weeks of time, the kid didn't lose weight, the kid didn't gain weight in that time frame that they were concerned about. Kids are different.

THE COURT: I would agree with you. The evidence of the lacking—of the failure to thrive is pretty sparse, but for whatever reason, your client didn't challenge the indicated report, so he was indicated.

[FATHER'S COUNSEL]: Well, Your Honor—

THE COURT: Six weeks. He couldn't manage to get through 6 weeks without having Children & Youth at his doorstep and taking the child away, again. So why in the world would I take this child out of a stable and good household and immediately put him into your client's household?

[FATHER'S COUNSEL]: [Because] there's no other way. There's no other way to let him be the father.

THE COURT: So I roll the dice on this? I don't try to transition in any way?

[FATHER'S COUNSEL]: I would say, and this is what I've been saying generally, and you have very good discretion—you exercise very good discretion. So what I'm saying to you is generally what the problems are and I would ask you to address them. And a big problem—

THE COURT: Well, I would expect a reasonable position from your client in terms of how he wants to transition his son from the current household into his household, [because] everything you've said is right. The law presumes that he should be the father, the law presumes that he should have custody or [Mother], for that matter, but she's indicating she doesn't wish to. But the question also becomes, that you have to also consider the fact this child really has never been outside the grandparent's [sic] home, and how do you transition from a supervised 6-hour a week situation to where he eventually gets his son back? So how do we transition to that point? I don't think it's just pulling a child out of a home and sticking him into the other home.

[FATHER'S COUNSEL]: I would say that you give him—give him— because the evidence that he's taking care of his own child that he's got in the household—

THE COURT: He has, and the [c]ourt would note for the record that little girl has been here in the [c]ourtroom, she's very beautiful. For almost 30 minutes, she was actually inside the courtroom, didn't make a peep, and was very well-behaved.

[FATHER'S COUNSEL]: All right. So I would say that you give him—

THE COURT: So he clearly can care for a child.

[FATHER'S COUNSEL]: Right.

THE COURT: I'm not worried about his caretaking [because] obviously that child is thriving.

[FATHER'S COUNSEL]: I will give you—I would say—

THE COURT: The problem is, is that this little boy has a home that he knows, and how do you transition from that home to his father's home?

[FATHER'S COUNSEL]: I would give him substantial—I would give my client substantial overnight visitation and I would—

THE COURT: Overnight right out of the gate?

[FATHER'S COUNSEL]: I would.

THE COURT: He goes from supervised to overnight?

[FATHER'S COUNSEL]: There's no—I would suggest that there's no reason—There's no evidence presented that he shouldn't be allowed—

THE COURT: Well, how about common sense? Does the [c]ourt just—to common sense?

[FATHER'S COUNSEL]: Judge, there's people that—just get overnight visitation. I mean, he's not incapable of handling a child overnight. There's nothing to suggest that—He handles his own child overnight.

THE COURT: That's true—

[FATHER'S COUNSEL]:—so—

THE COURT:—I'm not worried about his parenting skills, my concern becomes the child. It has nothing to do with his parenting skills, it's the child.

[FATHER'S COUNSEL]: Well, what evidence of this record is there to say that he wouldn't be—

THE COURT: [W]ell, the last time he had the child, Children & Youth got involved and had to take the child out of the home. That's the evidence.

[FATHER'S COUNSEL]: That was 2 years ago—more than 2 years ago.

THE COURT: It was 2 years ago, but the child regressed in that situation. Why wouldn't you want this child to be slowly introduced back into his household, get accustomed to it, and then be able to make the switch?

[FATHER'S COUNSEL]: Because there's not—I mean, why—why did I have—in another case if I had grandparents who have done absolutely everything right and have stepped up to the plate for years, and then they come into [c]ourt and—

THE COURT: And the other case you may be referring to, where the [c]ourt did that, is a situation where the child began doing every other weekend and then did every other week and then it got to the point where it was thriving in the mother's household.

[FATHER'S COUNSEL]: I would suggest—

THE COURT: So yes, if there was a track record here of your client and this child having a good relationship and having overnights and everything going well, then you have a stronger argument.

[FATHER'S COUNSEL]: That's exactly right.

THE COURT: He hasn't had an overnight in—2 years.

[FATHER'S COUNSEL]: But why?  Why is that?  Why is—

THE COURT: Why?  Because Children & Youth got involved and that was—he lost custody of his child.  That's what happened.

[FATHER'S COUNSEL]: This [c]ourt order that you—that Your Honor answered when we were here in the springtime, allowed them per their discretion to encourage and promote unsupervised—

THE COURT: Well, I'm not saying I'm not going to give them that discretion this time, but why shouldn't the [c]ourt structure something where this is done slowly as opposed to abruptly?

[FATHER'S COUNSEL]: I'm not gonna say that you're gonna—

THE COURT: I would agree with you.  There's virtually nothing on this record to suggest that his contact should continue to be supervised.

[FATHER'S COUNSEL]: Right.   But I would say that—The problem is, though, and I'm trying to work back to it—The problem is that if you don't give him substantial visitation, there's not ever gonna be—There's not gonna be like that other case which was kind of voluntary.   There's not gonna be a progression towards transfer.  In that case—

- 22 -

THE COURT: Well I can certainly do unsupervised for a period of months and then one overnight for a period of months, then every other weekend for a period of months, and then eventually at some point, have you back here for a review.

[FATHER'S COUNSEL]: I mean, I would ask that the [c]ourt just decide that there's gonna be a transfer right now, but if you're gonna do that, but I would suggest that he be able to have overnight visits. There's nothing on the record to suggest that he shouldn't be able to, given the fact that he's got—

THE COURT: I don't want to turn this child's world upside down.

[FATHER'S COUNSEL]: I understand, but—at some point in time, the people who are involved with this custody case are not promoting a situation for the child to be in a successful transition.

THE COURT: Listen, these people don't communicate period. Your client doesn't communicate with them and they don't communicate with him. I think it's abysmal on both sides. I can't imagine having a child that I'm not communicating with, even if they weren't the communicator, I would be communicating. If they weren't answering the phone, I would drive over and talk to them, so I don't—And I don't get how you don't know where your child lives. I don't get how he doesn't give me his specific address. I don't get the lack of communication, but quite frankly, we wouldn't be sitting here if the parties communicated, so I see this every time in these custody proceedings, and the only thing they're doing is assuring that this child is going to suffer. But that's as much on your client as it is on [Paternal Grandparents' counsel's] client. They both have an obligation to communicate with each other.

[FATHER'S COUNSEL]: I agree with you, but—but the problem is is that you look at what has occurred and—a 2-hour visitation that he asked for to go to the birthday party, which there would have been people around for—they weren't even given that. So what—what do we do to make sure—

THE COURT: We set up an order where they don't have as much discretion.

[FATHER'S COUNSEL]: I would say it certainly should be more time, and I would say certainly the evidence suggests that that's warranted, given the fact that—I would suggest that the evidence suggests that what's been presented, you can draw a reasonable inference that the child is craving his father's attention and is fighting over it, the attention with other sibling. I think that's basically what's been said and testified to. So given the opportunity for the kid to see his sibling, I, which the law encourages or promotes—

THE COURT: The law does require that.

[FATHER'S COUNSEL]:— on every single level.

THE COURT: It's a very strong public policy.

[FATHER'S COUNSEL]: Right, and—and—and fundamentally, I understand the court's decision—or—or desire to ensure that this is a smooth transition for the child, that he's not yanked from one household to the other, so I would suggest—that's why I'm suggesting that you give him liberal visitation right out of the gate, but the child—

THE COURT: Now you're suggesting something [different] from what you initially suggested.

[FATHER'S COUNSEL]: Right. But the child is still maintaining a home unit. It's not like—

THE COURT: So now you're suggesting to transition slowly?

[FATHER'S COUNSEL]: But I'm saying give liberal overnight visitation. That's what I'm suggesting.

THE COURT: Right out of the gate?

[FATHER'S COUNSEL]: Right out of the gate.

THE COURT: Okay. [PATERNAL GRANDPARENTS' COUNSEL]?

[PATERNAL GRANDPARENTS' COUNSEL]: Your Honor, as you've indicated, any transition is going to need to be very slow.

THE COURT: Well, what is your client's [sic] position?

[PATERNAL GRANDPARENTS' COUNSEL]: They would like primary custody obviously.

THE COURT: Okay, and—how are we going to go beyond supervised custody because there's really nothing on this record to suggest it has to be supervised?

[PATERNAL GRANDPARENTS' COUNSEL]: [W]ell, there's a lack—there's a disconnect between [Father] and the relationship with [Child].

THE COURT: I disagree.

[PATERNAL GRANDPARENTS' COUNSEL]: My client testified that there's—there's just this hi, how are you?  Let's go watch T.V.

THE COURT: That's not true, because the great grandfather testified he's out there playing soccer with him, playing tag—

[PATERNAL GRANDPARENTS' COUNSEL]: For a few minutes at a time.

THE COURT: Okay.

[PATERNAL GRANDPARENTS' COUNSEL]: He has 6 hours every weekend.

THE COURT: So—

[PATERNAL GRANDPARENTS' COUNSEL]: He doesn't exercise the full 6 hours.

THE COURT: Even if there's a disconnect, there's no threat of him hurting this child.  He has a 3-year old daughter. Apparently he's the primary caregiver to this little girl who's been running around the court, who is very healthy, and no one has taken that child away from him, so why can't he care for a 4-year old child—almost 5?

[PATERNAL GRANDPARENTS' COUNSEL]: I don't believe, Your Honor, that my clients indicated this on the record, however, I don't believe it's [Father] they have a problem with as far as any physical threat to the child.

- 25 -

THE COURT: Okay. Then who do they have a problem with?

[PATERNAL GRANDPARENTS' COUNSEL]: [Fiancée].

THE COURT: Based on what evidence?

[PATERNAL GRANDPARENTS' COUNSEL]: The Children & Youth involvement—and the regression.

THE COURT: Where he lost—

[PATERNAL GRANDPARENTS' COUNSEL]: The regression, the emotional regression.

THE COURT: Could it be that he was just taken out of their household and not given a chance to adapt to a new environment and that's why he regressed?

[PATERNAL GRANDPARENTS' COUNSEL]: It's possible, but that's not what Children & Youth, nor the doctor indicated, so—

THE COURT: Well, quite frankly, the Children & Youth evidence is pretty sparse, if that—if that. There's a thousand reasons why that child could have been in that situation. You have a child here who they have had custody of for 3 years, who looks very healthy, very happy, well-adjusted. Why your clients will not communicate with her is very difficult to comprehend, quite frankly. And why they don't allow her to come to the house is almost impossible to understand because she is the mother of one of their grandchildren. People don't like in-laws, people don't like that, and you've got to get over it, swallow your pride, and do what's best for the kids. Your clients have not demonstrated that they're doing that. They stepped up to the plate for [Child], but they certainly haven't done what's in [Sibling's] best interest by welcoming this woman into their home and trying to get into a situation where they can be active grandparents for that child, as well. And why should I trust them to do the right thing down the road and work this father into a situation where he starts to do what the law wants him to do? That's being a father. He can't be a father when they're babysitting him constantly.

[PATERNAL GRANDPARENTS' COUNSEL]: That's true, Your Honor, but they also can't force him to want more time, and when he has asked—

THE COURT: He called and asked for a birthday unsupervised and they wouldn't let him. What would the harm have been to allow him to take the child to a birthday party? He watches his 3-year old every day.

[PATERNAL GRANDPARENTS' COUNSEL]: Well, I believe the testimony was that he didn't indicate where they were going or anything like that.

THE COURT: Again, they're micro-managing everything about the relationship. He's the father.

[PATERNAL GRANDPARENTS' COUNSEL]: He hasn't acted like the father.

THE COURT: They don't know where [Sibling] goes every moment of every day, yet somehow she's fine.

[PATERNAL GRANDPARENTS' COUNSEL]: She hasn't resided in their household for 5 years.

THE COURT: So if [sic] called and says hey, I got a birthday party, can I take the kid to a birthday party? What do they have to know the itinerary for? It boggles—It boggles my mind.

[PATERNAL GRANDPARENTS' COUNSEL]: I understand, Your Honor.

THE COURT: It's a birthday party for a couple hours. It boggles my mind that he wants me to yank this kid out of the environment where he's stable and loving and doing—thriving and doing well and just throw him into his house, it boggles my mind likewise that they're not trying to figure out a way to get this child to their father.

[PATERNAL GRANDPARENTS' COUNSEL]: And it boggles my mind that [Father] doesn't spend the amount allowed under the order with his son. Six hours every week, that's not a lot of time, yet he doesn't exercise it all.

THE COURT: Well—it's probably—It's not a lot of time, but it's also an uncomfortable environment to have to go and sit there while you're under a microscope and being micro-managed by your parents. I'm not saying—

[PATERNAL GRANDPARENTS' COUNSEL]: He has no prob—

THE COURT: [Father] has done everything perfect here.

[PATERNAL GRANDPARENTS' COUNSEL]: He has no problem eating in their house, he has no problem going through their cupboards and eating in their house. [Paternal Grandmother] testified that he does that. I mean—He talks to his brother, he talks to his grandfather.

THE COURT: So your clients want primary physical custody, but where do I go beyond there?

[PATERNAL GRANDPARENTS' COUNSEL]: Beyond there, Your Honor—

THE COURT: Is it your client's [sic] position that it still has to be supervised?

[PATERNAL GRANDPARENTS' COUNSEL]: As far as for [Father], they have no issued [sic] with having unsupervised visitation. However, they are concerned about [Fiancée].

THE COURT: Why? There is a child that she cares for that's 3 years old, who's running around here—she's out there laughing right now, as a matter of fact.

[PATERNAL GRANDPARENTS' COUNSEL]: The testimony was, Your Honor, when [Fiancée] was on the phone that [Child] was shaking. That was undisputed, no one—no one rebutted that.

[THE COURT]: Okay, well—At some point in time he's gonna have to have a relationship with this person. This is—

[PATERNAL GRANDPARENTS' COUNSEL]: Correct, and perhaps the place to start—

THE COURT: It's the mother—

[PATERNAL GRANDPARENTS' COUNSEL]:—would have supervised—perhaps the place to start with that would be— have any contact with her be supervised, so that—

THE COURT: By [Father]?

[PATERNAL GRANDPARENTS' COUNSEL]: They would suggest somebody else, somebody other than [Father].

THE COURT: Okay.

[PATERNAL GRANDPARENTS' COUNSEL]: Because they're in the same household, but—as far as the partial custody, it needs—it needs to increase so that [Father] does have a relationship with his son and so that [Child] has a relationship with his sister, and with his father, and with [Fiancée], because she's in the household, but it needs to start slowly—like you've indicated.

THE COURT: [Mother], I know you've made your position clear. Do you have anything you wish to add?

[MOTHER]:No.

N.T., 9/26/16, at 181–200.

In his brief, Father argues that the trial court appears to have made one set of findings in its consideration of the custody/best interest factors, which seemed to weigh in favor of awarding primary physical to Father, but then the court arrived at a contrary result by awarding primary physical custody to Paternal Grandparents. Father's Brief at 12–15. Father has carefully selected portions of the trial court opinion to demonstrate that the trial court did not appropriately weigh the best interest factors, especially Child's need to be raised along with Sibling. *Id*. at 16–17.

The exchange between the trial court and the counsel demonstrates that the trial court's primary concern was for the best interest of Child. The

court sought counsel's input on how it could allow for a gradual transition of Child into Father's primary physical custody at his home.

This Court has stated:

> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

**S.M. v. J.M.**, 811 A.2d 621, 623 (Pa. Super. 2002) (quoting **Robinson v. Robinson**, 645 A.2d 836, 838 (Pa. 1994)).

Since the adoption of the Act, we have also explained that courts must consider each of the custody/best interest factors, and that the amount of weight that a court gives to any one factor is almost entirely within its discretion. **See M.J.M. v. M.L.G.**, 63 A.3d 331, 339 (Pa. Super. 2013), (citing **A.D. v. M.A.B.**, 989 A.2d 32, 35–36 (Pa. Super. 2010)) ("It is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case.").[4]

After our careful review of the entire record and the relevant law, we find that the trial court's conclusions are not unreasonable in light of the sustainable findings of the trial court, which are supported by the evidence in the record. **C.R.F. v. S.E.F.**, 45 A.3d 441, 443 (Pa. Super. 2012). The

---

[4] The one exception is that trial courts must give weighted consideration to those factors which affect the safety of the child. 23 Pa.C.S. § 5328(a).

record supports the trial court's determination that Child is doing well in Paternal Grandparents' primary physical, with supervised, partial custody in Father, and that Child will benefit from the stability of remaining primarily with Paternal Grandparents during the school year, yet slowly transitioning to Father's primary physical custody. Accordingly, we affirm the order of the trial court.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/19/2017